**O**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

American Heart Technologies, LLC, et al.,

               Plaintiff(s),

      v.

Amirhossein Jaberzadeh Ansari, et al.,

               Defendant(s).

Case No.:  2:22-cv-08387-MEMF-RAO

**ORDER GRANTING IN PART MOTION FOR SUMMARY JUDGMENT AND GRANTING MOTION TO STRIKE [ECF NOS. 63, 65]**

     Before the Court are a Motion for Summary Judgment (ECF No. 63) and a Motion to Strike Plaintiffs' Trade Secret Identification Statement (ECF No. 65) filed by Defendant and Counterclaimant Amirhossein Jaberzadeh Ansari. For the reasons stated herein, the Court GRANTS IN PART the Motion for Summary Judgment and GRANTS the Motion to Strike.

/ / /

/ / /

/ / /

**SUMMARY OF ORDER FOR *PRO SE* LITIGANT AMIRHOSSEIN JABERZADEH ANSARI**

The Court addresses two motions in this Order.

First, you requested that the Court grant summary judgment in your favor on Plaintiffs' four causes of action and your twelve counterclaims. ECF No. 63. American Heart Technologies, HeartLung Corporation, and Morteza Naghavi argued that the Court should deny your Motion for Summary Judgment because you did not show that the parties agreed on important facts of the case. ECF No. 66. This Order will explain why the Court GRANTS your Motion for Summary Judgment on Plaintiffs' two trade secret claims, breach of contract claim, and conversion claim, and waits to decide your Motion for Summary Judgment on your counterclaims because of your request.

Second, you requested the Court to strike Plaintiffs' Trade Secrets Identification Statement with prejudice for failure to identify the four categories of trade secrets. ECF No. 65. The Court GRANTS that Motion. Because American Heart Technologies and HeartLung Corporation were given a fair opportunity to identify their trade secrets, this Order will explain why the Court will not give Plaintiffs a second chance to amend. Because you are proceeding without an attorney, the Court included a section at the end of this Order with resources for self-represented litigants that you may find helpful.

**BACKGROUND**

I.    **Factual Background**

Plaintiff and Counterclaim Defendant American Heart Technologies, LLC ("American Heart") is a medical research and development company that invests in and develops medical technologies that focus on early detection of cardiovascular diseases, lung cancer, and other medical conditions. Plaintiff and Counterclaim Defendant HeartLung Corporation ("HeartLung") is a startup venture of American Heart.[1] American Heart and HeartLung collaborate with university medical centers to develop and commercialize advanced artificial intelligence ("AI") technologies for early detection of medical conditions. Counterclaim Defendant Morteza Naghavi ("Naghavi") is the

---

[1] The Court will refer to American Heart and HeartLung, collectively, as the "Plaintiffs."

1  founder and Chief Executive Officer of HeartLung.[2] Defendant and Counterclaimant Amirhossein

2  Jaberzadeh Ansari ("Ansari") is a former contractor of HeartLung.

3      This case concerns American Heart and HeartLung's allegations that Ansari misappropriated

4  Plaintiffs' trade secrets, breached relevant contracts and duties, and converted Plaintiffs' trade

5  secrets for his own personal use.

6  **II.    Procedural History**

7      On November 16, 2022, Plaintiffs filed a complaint against Ansari and Does 1 through 10.

8  ECF No. 1. Plaintiffs filed a First Amended Complaint on December 16, 2022, alleging four causes

9  of action: (1) trade secret misappropriation under federal law (18 U.S.C. § 1836, *et seq.*); (2) breach

10  of contract; (3) trade secret misappropriation under state law (Cal. Civ. Code § 3426); and (4)

11  conversion. *See generally* ECF No. 11 ("First Amended Complaint" or "FAC").

12      On April 3, 2023, Ansari filed an Answer and Counterclaim. ECF No. 18. Ansari asserted

13  fifteen affirmative defenses and twelve counterclaims against American Heart, HeartLung, Naghavi,

14  and Roes 1 through 10.[3] *See id.*

15      On December 25, 2024, Ansari filed a Motion for Summary Judgment and a Memorandum

16  of Points and Authorities.[4] ECF Nos. 63, 63-7. Ansari seeks summary judgment on Plaintiffs' four

17  causes of action and his twelve counterclaims. *See id.* Ansari also filed a Statement of

18  Uncontroverted Facts. ECF No. 63-9 ("DSUF"). Plaintiffs and Counterclaim Defendants filed an

19  opposition on January 16, 2025, and Ansari filed a reply on January 23, 2025. ECF Nos. 66; 69.

20

21  _____

22  [2] The Court will refer to American Heart, HeartLung, and Naghavi, collectively, as the "Counterclaim Defendants."

23  [3] The Court notes an inconsistency in the Answer and Counterclaim. Ansari alternates between referring to Roes 1 through 10 and Roes 1 through 5 as the named Counterclaim Defendants. *See generally* ECF No. 18.

24  For the sake of consistency, the Court will refer to these Counterclaim Defendants as Roes 1 through 10.

25  [4] The Court notes that Ansari failed to meet and confer in compliance with C.D. Cal. L.R. 7-3 prior to filing his Motion for Summary Judgment. Indeed, Ansari admits that the meet and confer took place on August 29, 2024—105 days before filing the Motion for Summary Judgment. ECF No. 63 at 2. The Court advises Ansari

26  to be mindful of the Local Rules, as well as all requirements set forth in the Court's Civil Standing Order. Per the Court's Civil Standing Order, "[t]he Court may strike or outright deny a motion or other relief if counsel

27  fails to meet and confer in good faith." Civil Standing Order at 5. Failure to comply with these rules in the future may result in such an outcome. But here, in the interest of justice, the Court will consider Ansari's

28  Motion for Summary Judgment.

Plaintiffs and Counterclaim Defendants also responded with a Statement of Genuine Dispute. ECF No. 66-3 ("PSUF").

On December 2, 2024, Plaintiffs filed a Trade Secret Identification Statement, identifying four categories of trade secrets at issue here (the "Alleged Trade Secrets"). ECF No. 58. On January 9, 2025, Ansari filed a Motion to Strike and a Memorandum of Points and Authorities. ECF Nos. 65, 65-1. Ansari seeks to strike Plaintiffs' Trade Secret Identification Statement with prejudice for failure to identify the four categories of trade secrets. *See id.* Plaintiffs filed an opposition on January 23, 2025. ECF No. 68. The Court held oral argument on this matter on April 10, 2025. At the Court's request, Ansari filed a subsequent statement with respect to his preference as to further proceedings on his state law counterclaims. ECF No. 75.

## MOTION FOR SUMMARY JUDGEMENT (ECF No. 63)

### I.    Applicable Law

#### A. Motion for Summary Judgment

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). "A moving party without the ultimate burden of persuasion at trial—usually, but not always, a defendant—has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). To carry its burden of production, the moving party must either: (1) produce evidence negating an essential element of the nonmoving party's claim or defense; or (2) show that there is an absence of evidence to support the nonmoving party's case. *Id.*

1    Where a moving party fails to carry its initial burden of production, the nonmoving party has

2    no obligation to produce anything, even if the nonmoving party would have the ultimate burden of

3    persuasion at trial. *Id.* at 1102–03. In such cases, the nonmoving party may defeat the motion for

4    summary judgment without producing anything. *Id.* at 1103. However, if a moving party carries its

5    burden of production, the burden shifts to the nonmoving party to produce evidence showing a

6    genuine dispute of material fact for trial. *Anderson*, 477 U.S. at 248–49. Under these circumstances,

7    the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the

8    depositions, answers to interrogatories, and admissions on file, designate specific facts showing that

9    there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal

10    quotation marks omitted). If the nonmoving party fails to produce enough evidence to create a

11    genuine issue of material fact, the motion for summary judgment shall be granted. *Id.* at 322.

12    A party cannot create a genuine issue of material fact simply by making assertions in its

13    legal papers. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co.*, 690 F.2d 1235,

14    1238 (9th Cir. 1982). Rather, there must be specific, admissible evidence identifying the basis for

15    the dispute. *See id.* "If a party fails to properly support an assertion of fact or fails to properly

16    address another party's assertion of fact . . . the court may . . . consider the fact undisputed." Fed. R.

17    Civ. P. 56(e)(2). The Court need not "comb the record" looking for other evidence; it is only

18    required to consider evidence set forth in the moving and opposing papers and the portions of the

19    record cited therein. *Id.* 56(c)(3); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir.

20    2001). The Supreme Court has held that "[t]he mere existence of a scintilla of evidence . . . will be

21    insufficient; there must be evidence on which the jury could reasonably find for [the opposing

22    party]." *Anderson*, 477 U.S. at 252. To carry its ultimate burden of persuasion on the motion, the

23    moving party must demonstrate that there is no genuine issue of material fact for trial. *Nissan Fire*,

24    210 F.3d at 1102; *Celotex Corp.*, 477 U.S. at 323.

25

26    / / /

27    / / /

28    / / /

**B.  Misappropriation of Trade Secrets**

i.  DTSA

Under the Defense of Trade Secrets Act ("DTSA"), a trade secret is defined as

all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—

(A) the owner thereof has taken reasonable measures to keep such information secret; and

(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information;

18 U.S.C. § 1839(3). "Confidentiality provisions constitute reasonable steps to maintain secrecy." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 660 (9th Cir. 2020). The term "misappropriation" is defined as

(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B) disclosure or use of a trade secret of another without express or implied consent by a person who--

(i) used improper means to acquire knowledge of the trade secret;

(ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—

(I) derived from or through a person who had used improper means to acquire the trade secret;

(II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or

1

(iii) before a material change of the position of the person, knew or had reason to know that--

2

3

(I) the trade secret was a trade secret; and

4

(II) knowledge of the trade secret had been acquired by accident or mistake;

5

18 U.S.C. § 1839(5).

6

        ii.  <u>CUTSA</u>

7

The California Uniform Trade Secrets Act ("CUTSA") sets forth a similar standard to the

8

DTSA. *See InteliClear, LLC*, 978 F.3d at 657 ("Courts have analyzed these claims together because

9

the elements are substantially similar.").

10

Under CUTSA, a "trade secret" is "information, including a formula, pattern, compilation,

11

program, device, method, technique, or process that: (1) [d]erives independent economic value,

12

actual or potential, from not being generally known to the public or to other persons who can obtain

13

economic value from its disclosure or use; and (2) [i]s the subject of efforts that are reasonable under

14

the circumstances to maintain its secrecy." Cal. Civ. Code § 3426.1(d).

15

The standard for misappropriation under CUTSA is the same as under DTSA, and entails (1)

16

the "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the

17

trade secret was acquired by improper means;" or (2) the "[d]isclosure or use of a trade secret of

18

another without express or implied consent" by a person who used improper means to acquire the

19

trade secret, had a duty to maintain its secrecy, or derived it from one who did have such a duty. Cal.

20

Civ. Code § 3426.1(b).

21

**C. Breach of Contract**

22

Under California law, the elements of a breach of contract claim are: (1) the existence of a

23

contract; (2) the plaintiff's performance or excuse for non-performance; (3) the defendant's breach;

24

and (4) damages to the plaintiff caused by the breach. *Hamilton v. Greenwich Investors XXVI, LLC*,

25

126 Cal. Rptr. 3d 174, 183 (Ct. App. 2011) (quoting *Reichert v. General Ins. Co.*, 442 P.2d 377, 381

26

(Cal. 1968)). Moreover, "[s]omeone who is not a party to the contract has no standing to enforce the

27

contract." *Hatchwell v. Blue Shield of Cal.*, 244 Cal. Rptr. 249, 253 (Ct. App. 1988).

28

/ / /

**II.    Findings of Fact[5]**

The Court finds that the following material facts are established for trial under Federal Rules of Civil Procedure 56(a) and 56(g).

**A. The Parties**

American Heart and HeartLung provide healthcare providers with access to health information for the prevention of heart disease, lung cancer, and other medical conditions.[6] Declaration of Morteza Naghavi, ECF No. 66-1 ("Naghavi Decl.") ¶ 1. Naghavi is a managing member of American Heart and the Chief Executive Officer of HeartLung. *Id.* ¶ 10. Ansari worked as a contractor at HeartLung from June 1, 2021, through approximately November 10, 2022. ECF Nos. 63-2, Ex. 11; 63-10 at 2.

**B. The Services Agreement**

On June 1, 2024, Ansari entered into a Services Agreement with American Heart and HeartLung. ECF No. 63-10 at 2. ("Services Agreement" or "Agreement"). Ansari was hired on a part-time basis as an independent contractor and worked as a deep learning computer scientist and bioengineer. *Id.* (Recital A, Section 6). The Agreement defined Ansari's scope of services as developing deep learning modules for automated measurement of bone density, coronary calcium, fatty liver, and other biomarkers in chest CT scans. *Id.* (Section 3.2).

Section 2 states that the Agreement "shall continue for six months until terminated by either party upon seven days written notice of such termination." *Id.* The Agreement also states:

> 4.    Compensation.  Contractor shall be paid thirty thousand US dollars per delivery of Milestone 1 as described in Exhibit A over six (6) months. Contractor shall receive two thousand five hundred dollars ($2,500) every two (2) weeks. However, Contractor is entitled to an acceleration of the entire thirty thousand dollars ($30,000) upon

---

[5] The facts set forth below are taken from the PSUF and DSUF and the various exhibits cited therein. *See* ECF Nos. 63-9, 66-3. Since the non-moving party had the opportunity to present their disputes in their filing, the Court treats all other facts listed in the PSUF and the facts not disputed in the DSUF as undisputed. *See id.* To the extent that any statements of fact are omitted, the Court concludes they are not material to the disposition of this Motion. To the extent that any of the facts set below were allegedly disputed by the opposing party, the Court concludes that no actual dispute exists or that the adopted language resolves the dispute.

[6] Ansari and Plaintiffs do not indicate whether this fact was disputed or undisputed. The Court will therefore treat this fact and other facts similarly with no indication as undisputed.

1
2
3
4

> completion of Milestone 1 per Company's satisfaction. Similarly, Contractor is offered an additional thirty thousand dollars ($30,000) for the delivery of each additional milestone namely Milestones 2, Milestone 3, and Milestone 4 as described in Exhibit A. Upon satisfactory performance by Contractor, and upon reaching funding milestones by Company, the parties may negotiate a full-time position for Contractor that would include stock incentives.

5

*Id.* (Section 4). The Agreement further states in Sections 6 and 8:

6
7
8
9
10

> 6.    Contractor Relationship to the Company.    The relationship between the Company and Contractor at all times during the term of this Agreement shall be that of an "Independent Contractor." At no time during the term of this Agreement will Contractor be considered an employee of the Company, but rather at all times will remain an Independent Contractor. Accordingly, Contractor has the sole right to manage, control, and direct the method, manner and means by which the Services are executed, as long as the manner of the execution meets with the terms and conditions in this Agreement, the Company is interested solely in the results.

11

> 8.    Ownership of Property.

12
13
14
15
16
17
18
19
20
21
22

> 8.1.    Title to Tangible Property.    All tangible materials (whether original or duplicates) including, without limitation, file or data base materials in whatever form, drawings, books, manuals, sales literature, equipment price lists, training materials, client record cards, client files, correspondence, documents, contracts, orders, messages, memoranda, notes, agreements, invoices, receipts, lists, software listings or printouts, all programmer generated materials including any materials cataloged on the Company storage medium, documentation of tests conducted by Contractor, all products, logos and web-site materials created for use by Contractor for Company programs or web-site use, pamphlets, advertising brochures or materials, whether for online or printed use, programs or processes developed by Contractor in the performance of the Services, specifications, models, computer programs, and records of any kind in the possession or control of Contractor which in any way relate or pertain to Company its intellectual property or the business proposed to be conducted by the Company, whether furnished to Contractor by the Company or prepared, compiled or acquired by Contractor during the Term, shall be the sole property of the Company. At any time upon request of the Company, and in any event promptly upon expiration or termination of this Agreement, Contractor shall deliver all such materials to the Company.

23
24
25

*Id.* (Sections 6, 8, 8.1). Attached as an addendum to the Agreement is Exhibit A, which defines the

four milestones for which Ansari was initially hired to complete. *Id.* (Exhibit A).

26
27
28

American Heart and HeartLung supplied Ansari with all the tools, equipment, and materials necessary to perform his work, including computers and hard drives.[7] PSUF ¶ 8. American Heart and HeartLung also reimbursed Ansari for project-related expenses.[8] PSUF ¶ 9.

C. **Addendum to the Services Agreement**

On September 11, 2020, Ansari, American Heart, and HeartLung executed an Exhibit B addendum (the "Addendum") to the Services Agreement. ECF No. 63-10 at 1. The Addendum states in relevant part:

1. Contractor has agreed to deliver an additional module for automated reporting of lung nodules and texture in chest CT scans as Milestone 5.
3. Company shall pay an additional $30,000 for Milestone 5. In total, Contractor shall receive $150,000 for reaching five Milestones approved by Company.
6. Failure to delivery by December 1st, 2021 shall have no negative impact on Contractor's payments.
8. Meanwhile, Contractor's bi-weekly payments shall increase from $2,500 to $5,000 starting September 15, 2021.
9. Contractor is committed to work full-time for Company's projects and actively participates in Company meetings for app development.
10. Contractor shall provide brief daily reports on achievements for the day and plans for the following day.

*Id.* The Addendum also states that "[u]pon closing of Series A funding which is expected at $30M post-money valuation, Company will offer Contractor a W9-based full-time employment agreement with a total compensation of $200,000 per year plus employment benefits including health coverage." *Id.*

/ / /

---

[7] Plaintiffs contend that this is disputed, arguing that "Defendant worked from home and used his own computer and storage device." The information that Plaintiffs offer does not genuinely dispute the proposed fact. In fact, Naghavi appears to concede in a deposition that American Heart and HeartLung "provided anything that [Ansari] asked and [that Plaintiffs] could afford." Declaration of Amirhossein Jaberzadeh Ansari, ECF No. 63-6 ("Decl. Ansari") ¶ 38, Ex. 61. When asked if Plaintiffs paid for those tools, Naghavi responded, "Yes." *Id.*

[8] Plaintiffs partially disputed this fact, arguing that "Plaintiff[s] reimbursed Defendant for all expenses related to Plaintiff[s'] project but not all Defendant's expenses as Defendant had his own business." PSUF ¶ 9. The Court has adjusted this language accordingly.

10

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

    **D.  Stock Restriction Agreement**

On September 3, 2021, Ansari and HeartLung entered into a Stock Restriction Agreement. ECF No. 63-11. HeartLung granted Ansari 100,000 shares of common stock vesting over 3 years. *Id.* The Stock Restriction Agreement states, "If [Ansari's] Business Relationship with [HeartLung] ceases, voluntarily or involuntarily, with or without cause, no Unvested Shares shall become Vested Shares thereafter with respect to [Ansari]." *Id.* (Section 2(a)).

    **E.  Revised Stock Restriction Agreement**

On August 24, 2022, Ansari and HeartLung revised the initial Stock Restriction Agreement. ECF No. 63-12. HeartLung increased Ansari's stock ownership to 500,000 shares, with 125,000 shares vesting immediately for a total of $125,000. *Id.*; ECF No. 63-2. Ex. 9. The revised Stock Restriction Agreement contains an identical provision determining the fate of unvested shares in the event Ansari and HeartLung's business relationship were to cease. *Id.* (Section 2(a)).

**III.**    **Discussion**

Ansari seeks summary judgment on (1) trade secret misappropriation under DTSA (First Cause of Action), (2) breach of contract (Second Cause of Action), (3) trade secret misappropriation under CUTSA (Third Cause of Action), (4) conversion (Fourth Cause of Action), and (5) twelve counterclaims. Plaintiffs have the ultimate burden of persuasion at trial on each of their claims. As a result, in the instant Motion, Ansari has the initial burden of production and ultimate burden of persuasion.

    **A.  Ansari is entitled to summary judgment on the DTSA and CUTSA claims.[9]**

"To succeed on a claim for misappropriation of trade secrets [], a plaintiff must prove: (1) that the plaintiff possessed a trade secret, (2) that the defendant misappropriated the trade secret, and (3) that the misappropriation caused or threatened damage to the plaintiff." *InteliClear, LLC*, 978 F.3d at 657–58 (citing 18 U.S.C. § 1839(5)). Ansari attacks Plaintiffs' trade secret claims under the first and second prongs, arguing that the claims fail because none of the Alleged Trade Secrets

---

[9] Given the similar standards between the federal and state trade secret misappropriation claims, the Court finds it appropriate to address the claims together. *See InteliClear, LLC*, 978 F.3d at 657.

1  qualify as protectable trade secrets under law and that the Alleged Trade Secrets have not been

2  misappropriated. ECF Nos. 63-7 at 7–8; 69 at 2–3.

3        Here, Plaintiffs have placed at issue the following four categories of trade secrets:

4        (1) Software algorithms, codes, and methodology used to read CT scan images to calculate

5             bone density scores ("First Alleged Trade Secret");

6        (2) Software algorithms, codes, and methodology used to read CT scan images to calculate

7             artery calcium scores ("Second Alleged Trade Secret");

8        (3) Manually labeled coronary artery calcium images ("Third Alleged Trade Secret"); and

9        (4) Manually labeled aorta images ("Fourth Alleged Trade Secret").

10  EFC No. 66-1, Ex. A. Based on the undisputed facts, the Court finds that none of the Alleged Trade

11  Secrets qualify as a protectable trade secret and GRANTS summary judgment as to all the Alleged

12  Trade Secrets.

13              i.   Plaintiffs have not adequately identified their trade secrets.[10]

14        To prove ownership of a trade secret, a plaintiff "must identify the trade secrets and carry the

15  burden of showing that they exist." *MAI Sys. Corp. v. Peak Comput., Inc.*, 991 F.2d 511, 522 (9th

16  Cir. 1993). "The plaintiff 'should describe the subject matter of the trade secret with sufficient

17  particularity to separate it from matters of general knowledge in the trade or of special knowledge of

18  those persons . . . skilled in the trade.'" *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164

19  (9th Cir. 1998). Plaintiffs must "clearly refer to tangible trade secret material" instead of referring to

20  a "system which potentially qualifies for trade secret material." *Id.* at 1167. Plaintiffs may not simply

21  rely upon "catchall" phrases or identify categories of trade secrets they intend to pursue at trial. *Id.*

22              *1.   Software algorithms, codes, and methodology used to read CT scan*
                     *images to calculate bone density scores (First Alleged Trade Secret)*

23

24        The Court finds that Plaintiffs' software algorithms, codes, and methodology used to read CT

25  scan images to calculate bone density scores is not a protected trade secret because it has not been

26  specifically identified. In *MAI Sys. Corp.*, the Ninth Circuit concluded that although the plaintiff

27

28  [10] The Court notes that it considered Plaintiffs' Trade Secret Identification Statement and opposition to the Motion to Strike in making this determination on the Motion for Summary Judgment. ECF Nos. 65, 68.

1    asserted that it had trade secrets in its diagnostic software and operating system, the trade secrets
2    themselves were not specifically identified. *MAI Sys. Corp.*, 991 F.2d at 522. The imprecision with
3    which Plaintiffs define the First Alleged Trade Secret is evident through the use of vague and
4    ambiguous phrases such as "[s]oftware algorithms, codes, and methodology." EFC No. 66-1, Ex. A.
5    Many courts have granted summary judgment where the alleged trade secrets were vaguely and
6    indefinitely defined. *See, e.g., Imax Corp.*, 152 F.3d at 1167 (concluding that "reasonable specificity
7    could only be achieved by identifying the precise numerical dimensions and tolerances as trade
8    secrets"); *RoadRunner Recycling, Inc. v. Recycle Track Sys., Inc.*, No. C 23-04804 WHA, 2024 WL
9    4876947, at *6 (N.D. Cal. Nov. 23, 2024) (granting summary judgment to defendant where plaintiff
10   "abandoned any pretense of [sufficiently] identifying" trade secrets in "machine-learning models").
11   What Plaintiffs have failed to do in their declarations or submitted evidence is provide complete
12   descriptions of algorithms, software architectures, database diagrams, user interfaces, or source code
13   that would allow Ansari to understand what he is accused of misappropriating so that he may
14   provide a defense. *Cf. InteliClear, LLC*, 978 F.3d at 659. "Courts and juries also require precision
15   because, especially where a trade secrets claim 'involves a sophisticated and highly complex'
16   system, the district court or trier of fact will not have the requisite expertise to define what the
17   plaintiff leaves abstract." *Id.* at 658 (quoting *Imax*, 152 F.3d at 1167). By making overbroad claims,
18   Plaintiffs failed to "clearly refer to tangible trade secret material," instead of referring to a "system
19   which potentially qualifies for trade secret protection." *Imax Corp.*, 152 F.3d at 1167. The Court
20   therefore GRANTS the Motion as to the First Alleged Trade Secret.

21
22                    *2.    Software algorithms, codes, and methodology used to read CT scan
                            images to calculate artery calcium scores (Second Alleged Trade
                            Secret)*

23            The Court finds that there is not a triable issue of fact as to whether the software algorithms,
24   codes, and methodology used to read CT scan images to calculate artery calcium scores is a
25   protected trade secret because it, too, has not been specifically identified for the same reasons noted
26   above. *See supra* Section III.A.i.1. The Court therefore GRANTS the Motion as to the Second
27   Alleged Trade Secret.
28

3.  *Manually labeled coronary artery calcium images (Third Alleged Trade Secret)*

The Court finds that this category of trade secrets has not been identified with sufficient particularity. To start, a photograph is generally not the type of information that qualifies as a trade secret. *See Warren v. Guerrero*, No. 21-CV-11236 (LTS), 2022 WL 525480, at *4 (S.D.N.Y. Feb. 22, 2022) (holding that a photograph displaying areas of plaintiff's body that were "'off limits'" did not constitute a trade secret). Photographs are not considered "'financial, business, scientific, technical, economic, or engineering information' within the meaning of the DTSA." *Id.* Plaintiffs suggest that the confidential nature of the patient CT scan images transforms it into a trade secret. *See* FAC ¶¶ 13, 27. However, as numerous courts have held in non-binding decisions, "[w]hile all trade secrets are confidential, not all confidential information is a trade secret." *Am. Student Fin. Grp., Inc. v. Aequitas Cap. Mgmt., Inc.*, No. 12-CV-2446-CAB (JMA), 2015 WL 11237638, at *9 (S.D. Cal. Feb. 12, 2015); *see Traverse Therapy Servs., PLLC v. Sadler-Bridges Wellness Grp.*, PLLC, No. C23-1239, 2024 WL 1701970, at *3 (W.D. Wash. Apr. 19, 2024) (finding that plaintiff incorrectly "conflate[d] the mere existence of a patient list that it is legally required to keep confidential per the Health Insurance Portability and Accountability Act of 1996 ('HIPPA') with a trade secret"); *AA Med. P.C. v. Almansoori*, No. 20CV03852DGJMW, 2023 WL 7688688, at *10 (E.D.N.Y. Oct. 4, 2023), report and recommendation adopted, No. 20-CV-03852 (DG) (JMW), 2024 WL 168332 (E.D.N.Y. Jan. 16, 2024) (finding that the confidential nature of patient records did not transform it into a trade secret); *Elsevier Inc. v. Doctor Evidence, LLC*, No. 17-CV-5540 (KBF), 2018 WL 557906, at *5 (S.D.N.Y. Jan. 23, 2018) ("[C]onfidential information" is not equivalent to "trade secrets").

Plaintiffs also suggest that the manually applied labels on the CT scan images transform the photographs into a trade secret. However, it is the obligation of Plaintiffs to identify with specificity the precise labels that constitute as trade secrets. Plaintiffs make no showing here. The declarations and submitted evidence lack any details about how the labels constitute a "method, technique, or process" that "derive[ ] independent economic value . . . from not being generally known to . . . another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3). Ansari is not provided sufficient notice of what he is alleged to have

misappropriated, since Plaintiffs do not identify the labels with sufficient particularity to separate them from matters of general knowledge (or of specific knowledge of those persons skilled in the trade). *See Imax Corp.*, 152 F.3d at 1164. The Court therefore GRANTS the Motion as to the Third Alleged Trade Secret.

### 4.  Manually labeled aorta images (Fourth Alleged Trade Secret)

The Court finds that there is not a triable issue of fact as to whether this category of trade secrets has been sufficiently identified for the same reasons noted above. *See supra* Section III.A.i.3. The Court therefore GRANTS the Motion as to the Fourth Alleged Trade Secret.

### ii.  A genuine dispute of material fact does not exist as to whether Ansari misappropriated Plaintiffs' Alleged Trade Secrets.

Because Plaintiffs have not sufficiently identified their Alleged Trade Secrets, the Court concludes there is no genuine dispute as to whether Ansari misappropriated any trade secrets. The Court therefore will not reach the second prong of the misappropriation analysis.

### B.  Ansari is entitled to summary judgment on the breach of contract claim.

Ansari contends that the breach of contract claim fails because Plaintiffs have not shown Ansari refused to return all tangible and intangible property owned by HeartLung. ECF No. 63-7 at 10. As discussed previously, the Court found that no genuine dispute of material fact exists as to whether Ansari misappropriated any of Plaintiffs' Alleged Trade Secrets. *See supra* Section III.A.ii. However, the Court notes that Plaintiffs allege that Ansari breached Section 8 of the Services Agreement by refusing to return all property owned by Plaintiffs. FAC ¶ 25. Put another way, although Plaintiffs' DTSA and CUTSA claims fail, it is undisputed that Ansari agreed to return all tangible and intangible property back to Plaintiffs upon request. The parties do not dispute that the Services Agreement constitutes a valid contract (FAC ¶ 42; ECF No. 63-7 at 9), but, rather, Plaintiffs argue that Ansari did not substantially perform his obligations under Section 8 (FAC ¶ 44).

Ansari claims that while he "does not have Plaintiff[s'] actual files," "he created a record of some of the filenames . . . [he] returned . . . to use as evidence" and that such "record . . . is not against [Section] 8.1" of the Services Agreement. ECF No. 69 at 3. Ansari offered evidence of an email exchange where he informed Naghavi that he returned Plaintiffs' tangible and intangible

property. ECF No. 63-2 at 23. Ansari also shared his login credentials to SureMD, a subscription-based cloud-storage platform with access to the projects he managed. Ansari Decl. ¶ 14; ECF No. 63-2 at 23; *see* ECF No. 63-7 at 9–11. Plaintiffs were given 10 months to download the data before Ansari canceled his subscription. Ansari Decl. ¶ 14; ECF No. 63 at 9. Ansari has therefore met his initial burden of production.

Plaintiffs contend that Ansari still possesses their intangible property and will not destroy it as instructed. ECF No. 66 at 4. However, at the hearing Plaintiffs confirmed that the only evidence they have to support this allegation is a conclusory statement from Naghavi, who declared that Ansari "has kept the identified trade secrets and did not return and/or destroy them." Naghavi Decl. ¶ 6. The Court notes that this evidence alone is not enough to meet Plaintiffs' burden at the summary judgment stage. Thus, drawing all reasonable inferences in favor of the non-moving party, as the Court is required to do, *see Diebold, Inc.*, 369 U.S. at 655, it appears no genuine issue of material fact remains with respect to whether Ansari breached the Agreement for failing to return intangible property back to Plaintiffs, even if some of the property was not sufficiently identified to constitute a trade secret or not shown to be a protectible trade secret. The Court therefore GRANTS summary judgment on this ground.

### C.  Ansari is entitled to summary judgment on the conversion claim.

Ansari contends that there is no basis for the conversion claim because Plaintiffs cannot establish that he used or disposed of their property in a manner inconsistent with Plaintiffs' property rights. ECF No. 63-7 at 11. "Conversion is the wrongful exercise of dominion over the property of another." *Lee v. Hanley*, 354 P.3d 334, 344 (Cal. 2015) (quoting *Welco Electronics, Inc. v. Mora*, 166 Cal. Rptr. 3d 877, 882 (Ct. App. 2014)). A plaintiff asserting a claim for conversion must establish: (1) the plaintiff's ownership or right of possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages. *Id.* (quoting *Welco*, 166 Cal. Rptr. 3d at 882).

Plaintiffs argue that Ansari converted "computers, storage devices, and all Trade Secrets" for his own personal use. FAC ¶ 14. Ansari notes that he returned Plaintiffs' tangible and intangible property and no longer has access to any of it. ECF No. 63-7 at 11; Decl. Ansari ¶ 14. Ansari points

to evidence that Plaintiffs submitted showing some of the computers, monitors, keyboard, power cables, and storage devices he returned. Decl. Ansari ¶ 14; FAC ¶ 28, Ex. M. Moreover, Ansari has provided an email exchange demonstrating that he returned the property at issue on November 18, 2024, and that Naghavi confirmed receipt the next day. ECF No. 63-2 at 22–24. Ansari has therefore met his initial burden of production. Plaintiffs state that Ansari still possesses files of the Alleged Trade Secrets and refuses to destroy them, hence narrowing the scope of their conversion claim to intangible property. ECF No. 66 at 4.

i.  <u>Trade secret law does not preempt Plaintiffs' conversion claim.</u>

As an initial matter, the Court finds that Plaintiffs' conversion claim is not preempted by trade secret law. CUTSA "occupies the field" of common law claims based on the misappropriation of a trade secret. *K.C. Multimedia, Inc. v. Bank of America Tech. & Operations, Inc.*, 90 Cal. Rptr. 3d 247, 257 (Ct. App. 2009). The statute preempts non-contractual civil claims that are "based on the same nucleus of facts" as the misappropriation claim. *Id.* at 258 (quoting *Digital Envoy, Inc. v. Google, Inc.*, 370 F.Supp.2d 1025, 1035 (N.D. Cal. May 20, 2005)); *see* Cal. Civ. Code § 3426.7. The California Court of Appeal noted that "[d]epending on the particular facts pleaded, the statute can operate to preempt . . . specific common claims," including conversion. *Id.* at 261. As a result, state trade secret law "provides the exclusive civil remedy for conduct falling within its terms." *Silvaco Data Sys. v. Intel Corp.*, 109 Cal. Rptr. 3d 27, 50–51 (Ct. App. 2010), *overruled on other grounds*, *Kwikset Corp. v. Superior Court*, 246 P.3d 877 (Cal. 2011). When determining whether causes of action share a common nucleus of facts, a court considers the "factual predicate for the claim" and looks to the "conduct at the heart" of the claim. *K.C. Multimedia, Inc.*, 90 Cal. Rptr. 3d at 960. Where the "gravamen of the wrongful conduct asserted here is the misappropriation of trade secrets," that conduct legally "falls within the statutory definition of 'improper means' of acquiring a trade secret," and therefore "[f]actually . . . derives from 'the same nucleus of facts' as the trade

1  secrets claim, and is therefore preempted." *Id.* at 961 (quoting *Digital Envoy*, 370 F.Supp.2d at

2  1035).[11]

3    Although it appears that Plaintiffs' conversion and trade secret misappropriation claims share

4  a common nucleus of facts, California law permits a party to plead factually and legally inconsistent

5  theories in separate counts. *See* 4 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 402, p. 542; *see*

6  *also McCalden v. California Library Ass'n,* 955 F.2d 1214, 1219 (9th Cir.1990) (recognizing liberal

7  pleading policy embodied in Rule 8(e)(2)). In light of this, it appears inappropriate to prohibit a

8  plaintiff to proceed with a conversion claim—even where the facts do totally overlap with a trade

9  secret misappropriation claim—when the misappropriation claim fails, especially for a reason

10  specific to trade secret law, such as (as here) failure to identify the alleged trade secrets with

11  particularity. In any event, it appears that Plaintiffs' conversion claim is based on a broader spectrum

12  of misconduct than misappropriation alone, given the allegations about how those Alleged Trade

13  Secrets were separately protected under the parties' agreements. Thus, the Court finds that the

14  conversion claim is not preempted by CUTSA. The Court notes, however, that this would not permit

15  double recovery if both a trade secret misappropriation and a conversion claim were permitted to go

16  forward on the same underlying set of facts.

17     ii. <u>There is no genuine dispute of material fact as to whether Ansari converted Plaintiffs' intangible property.</u>

18    Ansari disputes the second and third prongs of the conversion test: namely, whether Plaintiffs

19  have (1) submitted enough evidence showing that he exercised wrongful dominion of their property

20  and (2) sufficiently proven damages.[12] ECF No. 63-7 at 11. "Possession of the property coupled with

---

[11] District courts within the Ninth Circuit have extended these preemption principles to cases involving DTSA claims. *See, e.g., McCandless Grp., LLC v. Coy Collective, Inc.*, 2022 WL 2167686, at * 5 (C.D. Cal. Feb. 14, 2022) ("DTSA shall not preempt any state law remedy and CUTSA serves as the sole remedy for the misappropriation of trade secrets under California state law . . . . Accordingly, the Court agrees Plaintiff cannot circumvent CUTSA preemption by asserting a claim under DTSA."); *Agile Sourcing v. Dempsey*, 2021 U.S. Dist. LEXIS 204631, at * 22 (C.D. Cal. July 15, 2021) ("The fact that Plaintiff has chosen not to plead a violation of CUTSA does not change the law's preemptive effect on its tort claim.").

[12] The Court notes that Plaintiffs raise a valid conversion claim. Traditionally, a claim for conversion has applied only to tangible property, but "California law now holds that . . . intangible property interests, too, can be converted." *Voris v. Lampert*, 7 Cal.5th 1141, 1151 (2019).

refusal to return it is sufficient to support a defendant's liability for conversion." *Express Media Grp., LLC v. Express Corp.*, No. C 06-03504 WHA, 2007 WL 1394163, at *4 (N.D. Cal. May 10, 2007) (citing *Schroeder v. Auto Driveway Co.*, 11 Cal.3d 908, 918, 114 Cal. Rptr. 622 (Ct. App. 1974)). Moreover, the measure of damages for a conversion claim is presumed to be the amount equal to the value of the property at the time of conversion and an amount sufficient to compensate plaintiff for the pursuit of the property. Cal. Civ. Code § 3336. As discussed previously, the Court finds that Plaintiffs have not adequately shown that Ansari still possesses their intangible property. *See supra* Section III.B. As a result, Plaintiffs fail to satisfy the second prong of the conversion test. The Court therefore GRANTS the Motion on this ground.

### D. The Court declines to reach the question of whether Ansari is entitled to summary judgement on his state law counterclaims.[13]

At the hearing on this matter, when the Court indicated its intention to grant summary judgment on all of the Plaintiff's claims, Ansari raised the question of whether his state law counterclaims should be heard in state court.  The Court indicated that should it grant summary judgment on all of the Plaintiff's claims, it would need to make a determination as to whether to continue to exercise supplemental jurisdiction over Ansari's counterclaims, which all arise out of state law. Ansari asked for the opportunity to consider whether he preferred to proceed in federal court or request remand to state court. In his subsequent filing, Ansari requested that the Court either grant summary judgment in his favor on the state law counterclaims or decline to exercise jurisdiction over them. ECF No. 75.

Principles of pendent jurisdiction have been codified in the supplemental jurisdiction statute, 28 U.S.C. § 1367.  The supplemental jurisdiction statute "reflects the understanding that, when deciding whether to exercise supplemental jurisdiction, 'a federal court should consider and weigh in each case, and *at every stage of the litigation*, the values of judicial economy, convenience, fairness, and

---

[13] The Court notes that Ansari did not allege the misclassification claim as a standalone counterclaim. Nevertheless, the Court finds that there are enough facts upon which it could legally grant summary judgment on this issue. *See* Fed. R. Civ. P. 56(a) (permitting summary judgment as to "[a] part of [a] claim or defense"). Because the misclassification claim is dispositive of the other counterclaims, the Court will address this issue first.

comity.'" *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (emphasis added) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).  In light of the foregoing, the Court orders the Plaintiffs to show cause in writing why the Court should exercise supplemental jurisdiction over Ansari's state law counterclaims. *See* 28 U.S.C. § 1367(c).

In the interests of judicial economy, the Court will hold in abeyance its determination over whether Ansari is entitled to summary judgment on his state law counterclaims pending a determination on whether it will decline to exercise supplemental jurisdiction of those claims.

## MOTION TO STRIKE (ECF No. 65)

Ansari seeks to strike Plaintiffs' Trade Secret Identification Statement for failure to identify protectible trade secrets. In opposition, Plaintiffs contend that they have identified four separate and distinct trade secrets. ECF No. 68. Federal Rule of Civil Procedure 12(f) provides that a court may "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). The function of a motion to strike is "to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial." *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010) (citations omitted). As discussed previously, the Court has granted summary judgment as to all the Alleged Trade Secrets because Plaintiffs have not adequately identified them with sufficient particularity. *See supra* Section III.A. Plaintiffs were already given an opportunity to identify their Alleged Trade Secrets, and because the Trade Secret Identification Statement veered so greatly from what the Court required, the Court will not give Plaintiffs another chance to amend. The Court therefore GRANTS the Motion with respect to Plaintiff's Trade Secret Identification Statement.

/ / /

/ / /

/ / /

1    ### RESOURCES FOR *PRO SE* LITIGANTS

2    Although Ansari is proceeding *pro se*, *i.e.*, without legal representation, he nonetheless is

3    required to comply with Court orders, the Local Rules, and the Federal Rules of Civil Procedure. *See*

4    C.D. Cal. L.R. 83-2.2.3. The Local Rules are available on the Court's website,

5    http://www.cacd.uscourts.gov/court-procedures/local-rules. The Court cannot provide legal advice to

6    any party, including *pro se* litigants. There is a free "*Pro Se Clinic*" that can provide information and

7    guidance about many aspects of civil litigation in this Court.

8    Public Counsel runs a free Federal *Pro Se* Clinic where *pro se* litigants can get information

9    and guidance. The Clinic is located at the Roybal Federal Building and Courthouse, 255 East

10   Temple Street, Los Angeles, CA 90012. *Pro se* litigants must call or submit an on-line application to

11   request services as follows: on-line applications can be submitted at

12   http://prose.cacd.uscourts.gov/los-angeles, or call (213) 385-2977, ext. 270.

13   Public Counsel also has extensive resources for *pro se* litigants at its website located at

14   https://publiccounsel.org/services/federal-court/.

15   The Court is also informed that the LA Law Library, located across the street from the First

16   Street Courthouse at 301 W. First Street, Los Angeles, CA 90012, also has extensive resources for

17   *pro se* litigants. The LA Law Library can be reached via email at reference@lalawlibrary.org, or via

18   telephone at (213) 785-2513.

19   ### CONCLUSION

20   For the reasons stated herein, the Court ORDERS as follows:

21   1.  Summary Judgment is GRANTED to Ansari on Plaintiffs' federal and state trade secret

22       claims, breach of contract claim, and conversion claim. (Claims 1 through 4).

23   2.  Summary Judgment is GRANTED to Ansari on the Misclassification as Independent

24       Contractor Claim.

25   3.  Plaintiffs are ORDERED to show cause in writing why the Court should exercise

26       supplemental jurisdiction over Ansari's counterclaims.

27   4.  Plaintiffs SHALL FILE a Response to this Order to Show Cause by no later than fourteen

28       days from the date of this order. The failure to timely or adequately respond to this Order to

1         Show Cause may, without further warning, result in the Court declining to exercise

2         supplemental jurisdiction over Ansari's counterclaims pursuant to 28 U.S.C. § 1367(c).

3     5.   The Motion to Strike (ECF No. 65) is GRANTED.

4

5         IT IS SO ORDERED.

6

7 Dated: April 21, 2025

8                          MAAME EWUSI-MENSAH FRIMPONG

9                            United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28